**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| _____ : | |
| PATSY CHAMBERS, : | Civil Action No.: 18-14857 (FLW) |
| Plaintiff, : | |
| : | **OPINION** |
| vs. : | |
| : | |
| LLMD ASSOCIATES, LLC d/b/a : | |
| WATER'S EDGE HEALTHCARE AND : | |
| REHABILITATION CENTER, : | |
| : | |
| Defendant. : | |
| _____ : | |

**WOLFSON, Chief Judge:**

Plaintiff Patsy Chambers ("Plaintiff" or "Ms. Chambers"), alleges that her former employer, Water's Edge Healthcare and Rehabilitation Center ("Defendant" or "Water's Edge"), violated the New Jersey Law Against Discrimination ("NJLAD"), and Title VII of the Civil Rights Act of 1964 ("Title VII"), by failing to take prompt and adequate action to prevent and correct an alleged hostile work environment based on sexual harassment. Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendant's motion is **GRANTED**.

## I.   FACTUAL AND PROCEDURAL HISTORY

### A.  Plaintiff and Water's Edge

The following facts are undisputed unless otherwise noted. In 1995, Plaintiff began working as a receptionist at Water's Edge, a postacute rehabilitation and longterm care facility in Trenton, New Jersey, and she held that position through July 2019. ECF No. 24-2, Defendant's Statement of Undisputed Material Facts ("Def. SOMF") ¶¶ 1,4. As a receptionist, Plaintiff was

1

stationed in the reception area and her job duties included answering the phone, distributing money to residents, collecting payments, talking to residents, updating paperwork, passing out cigarettes to residents, and generally assisting the residents, as necessary. *Id*. at ¶¶ 9-10.

Water's Edge has various policies prohibiting harassment and discrimination in the workplace and provides training for all employees on prevention mechanisms and the available complaint procedures. Def. SOMF ¶¶ 1,3,13-14. During the course of Plaintiff's employment, she attended some of those trainings, and was aware of the procedures in place for reporting a harassment complaint. *Id*. at ¶¶ 2.

### B. **Mr. Matthew's Harassment of Plaintiff**

Plaintiff's claims stem from a series of interactions with a co-worker, Terence Mathews, and Water's Edge's response to his behavior. Mr. Matthews did not work directly with Plaintiff; rather, he was employed as a Housekeeping Department Floor Tech, and was also a member of, and union delegate for, the United Hospital and Healthcare Workers, District 1199J (the "Union"), the collective bargaining agent at Water's Edge. *Id*. at ¶ 12; Pl. Reply SOMF ¶59. During his time at Water's Edge, Mr. Matthews also attended trainings on workplace harassment and acknowledged that he was aware of Water's Edge's anti-harassment policies and procedures. Def. SOMF ¶¶ 13-14.

Plaintiff's difficulties with Mr. Matthews first began in 2013, when Mr. Matthews allegedly called Plaintiff a "little bitch." *Id*. at ¶ 15. Plaintiff reported the incident to Mr. Dallos, Water's Edge's Licensed Nursing Home Administrator. *Id*. at ¶¶ 6, 16. Plaintiff's direct supervisor was Rosa Cruz, and Mr. Dallos was Ms. Cruz's supervisor. *Id*. at ¶ 6. Mr. Dallos spoke to Mr. Matthews about the incident, but Plaintiff was not made aware of what, if any additional steps, Mr. Dallos may have taken to address the complaint. *Id*. at ¶ 17. According to Mr. Dallos,

Mr. Matthews denied making the comment to Plaintiff and no other employees witnessed the incident. *Id*. at ¶ 18. During his deposition, Mr. Dallos testified that he had never received any other complaints that Mr. Matthews had made "profane" or "vulgar" comments in the workplace. *Id*. at ¶ 18. As a result, Mr. Matthews was not disciplined following that incident. *Id*.

In September 2015, Plaintiff reported a second confrontation with Matthews. On that day, Plaintiff left the building with another coworker in order to go smoke a cigarette and Mr. Matthews followed the of them out of the building. Chambers Dep., 88:9-20; *Id*. at ¶ 20. Aware that Mr. Matthews was behind her, Ms. Chambers "turned around came back in." Chambers Dep., 88:9-20; Def. SOMF ¶ 20. After she walked away from Matthews, he purportedly stated "you can't do anything with ignorant people," which Plaintiff believed was directed at her. Def. SOMF ¶ 20. During her deposition, Plaintiff elaborated that after she went back inside Mr. Matthews "got mad because [she] didn't stay out there with them because [she] didn't ever want to be around him . . . that's when he said ignorant, you know, and other nasty stuff but every time [she] would go out, he would follow [her] no matter where [she] went in the building." Pl. Reply SOMF. ¶ 20; Chambers Dep., 88:9-20.

Plaintiff reported the incident to Mr. Dallos, as well as Chaya Weinberg, the Assistant Licensed Nursing Home Administrator. Def. SOMF ¶¶ 6, 20. On September 16, 2015, Mr. Dallos arranged a meeting with Mr. Matthews and a representative from the Union, during which Mr. Dallos explained Water's Edge's policies and procedures related to harassment in the workplace and provided Mr. Matthews with copies of the policies. *Id*. at ¶ 21. At the conclusion of the meeting, Mr. Dallos issued Mr. Matthews a "Corrective Action Notice" for "Rudeness to Employee"; however, Mr. Matthews refused to sign the Corrective Action Notice because he denied making the statement. *Id*. That same day, Plaintiff met with Mr. Dallos, Ms. Weinberg

3

and Sandy Mozdierz, Water's Edge's VP of Business Development, to discuss Water's Edge's response to her harassment complaint. *Id*. at ¶ 22. Plaintiff was advised that the issue had been addressed with Mr. Matthews and that if any further incidents occurred, Plaintiff should report them to management. *Id*. Ms. Weinberg's meeting notes also reflect that Plaintiff was told "should another incident occur it will result in termination of employment for [Mr. Matthews.]" *See* Declaration of Scott I. Fegley ("Fegley Cert."), Ex. B, Meeting Notes.

Plaintiff reported another incident with Mr. Matthews to Water's Edge Management approximately a year and a half later on April 23, 2017. *Id*. at ¶ 24. On that occasion, Plaintiff reported that Mr. Matthews provided a cigarette to one of the residents in violation of Water's Edge's Smoking Policy. *Id*. The Smoking Policy provides for each resident to have no more than one cigarette per hour, between 8 a.m. and 8 p.m., which Plaintiff, or whichever receptionist was on duty, would distribute. *Id*. In Plaintiff's view, Mr. Matthews' actions were intended make Plaintiff "appear unfair and in a poor light to other residents who had to abide by the smoking policy and would assume [Plaintiff] had given the cigarette to the resident in question." *Id*. In response to Plaintiff's complaint, on April 24, 2017, Mr. Dallos met with Mr. Matthews and reviewed the Water's Edge smoking policy. *Id*.

That same month, Plaintiff reported to Ms. Weinberg that Mr. Matthews would often perform his housekeeping duties in the lunchroom, during Plaintiff's lunch break. *Id*. at ¶25. Even when Ms. Chambers changed the timing of her lunch break, she nonetheless, continued to encounter Mr. Matthews in the lunchroom. Pl. SOMF. at ¶26. Eventually, she began eating in the employee breakroom in order to avoid him. *Id*. At that time, she also reported that, on one occasion, Mr. Matthews borrowed her newspaper, which was clearly labeled with Plaintiff's name on it, from another coworker, and refused to return it in a timely fashion. Def. SOMF. at ¶25;

4

Blasio Decl, Ex. 3, Deposition of Patsy Chambers ("Chambers Dep.") 107:18 to 108:23.  During that meeting, Plaintiff also complained that Mr. Matthews "curses up and down the hallways and says profanities."  Def. SOMF. at ¶25.

In response to Plaintiff's complaints, Ms. Weinberg met with Mr. Matthews.  DeBlasio Dec., Ex. 11, Meeting Notes.  Ms. Weinberg's documentation of the meeting explained that "it was not a discipline meeting," however, she and Mr. Dallos explained Ms. Chambers' concerns and asked Mr. Matthews to limit his time in areas where Ms. Chambers was present because she was uncomfortable in his presence.  *Id.*  Following her conversation with Mr. Matthews, Ms. Weinberg told Plaintiff that Mr. Matthews' work schedule would be altered so that he would not be in the lunch area at the same time as Plaintiff.  *Id.* at ¶26.  During her deposition, Plaintiff testified that despite reporting the incident to Ms. Weinberg, there were still occasions when Mr. Matthews would work in the lunchroom during Plaintiff's lunch break despite purportedly having been instructed not to do so.  *Id.* at ¶28.  However, Plaintiff did not notify any of the managers of that fact.  *Id.*

A few months later, on June 20, 2017, Plaintiff notified Mr. Dallos that Mr. Matthews was present in the lobby area despite having been instructed to stay out of the lobby area when Plaintiff was working.  *Id.* at ¶30.  When Mr. Dallos arrived in the lobby, he found Mr. Matthews "sitting in a chair speaking with one of the facility residents from the second floor."  Deblasio Decl, Ex. 12, Meeting Notes.  At that time, Mr. Dallos reminded Mr. Matthews to stay out of the lobby area when Ms. Chambers was working.  *Id.*

The next day, Plaintiff heard that Mr. Matthews was requesting that other employees sign a petition addressing the fact that Plaintiff was accusing Mr. Matthews of sexual harassment.  *Id.* at ¶31.  Plaintiff complained to Mr. Dallos about the petition, and thereafter, he and Ms. Weinberg

conducted an investigation into the situation.  *Id*. at 31-32.  During the investigation, they met with

Mr. Matthews and Joni Reese, a union representative for Mr. Matthews' union.  *Id*. at ¶32.  During

the meeting, Ms. Reese represented that  the petition was the result of Matthews' attempt to collect

signatures from co-workers to vouch for his good character.  *Id*. at ¶32.  Mr. Matthews further

elaborated, during his deposition, that the document was just a list of signatures which did not

specifically reference Plaintiff and that he did not recall what happened to the list.  *Id*.  However,

the petition was never included as part of the discovery in this matter.  Pl. SOMF. at ¶33.

On June 26, 2017,  in response to a request from Mr. Dallos, Ms. Weinberg, and Sherry

Faust, Water's Edge's Director of Operations, Plaintiff submitted a written statement outlining all

of the aforementioned incidents with Mr. Matthews.  *Id*. at ¶34.  Plaintiff's statement also reported

that two security guards, Kevin Jackson and David Cox, were aware of the situation between

Plaintiff and Mr. Matthews.  Pl. Reply SOMF at ¶63.

That same day, Ms. Faust, Ms. Weinberg, and Mr. Dallos met with Mr. Matthews and Ms.

Reese.  Mr. Matthews explained that on June 20, 2017, he had only entered the lobby in order to

perform his  job duties.  *Id*. at ¶35.  However, Mr. Matthews agreed to minimize his interaction

with Plaintiff.  *Id*.  A couple days later, on June 28, 2017, Mr. Dallos and Ms. Weinberg met with

Plaintiff and discussed the earlier meeting and Plaintiff's complaints.  *Id*.[1]  During that meeting,

Plaintiff notified Mr. Dallos and Ms. Weinberg of an incident earlier that morning when Mr.

Matthews allegedly walked very close to Plaintiff and "brushed shoulders" with her.  Def. SOMF

at ¶ 37.  Plaintiff encouraged Mr. Dallos and Ms. Weinberg to look at the surveillance video from

---

[1]     Defendant asserts that Plaintiff "explained that she felt bad that she had not brought her
concerns about Mr. Matthews to them sooner."  Def. SOMF at ¶36.   Plaintiff denies that she
said anything to that effect. Pl. SOMF. at ¶36.

the incident, which they did.  *Id.*[2]  After viewing the video, Mr. Dallos and Ms. Weinberg met with

Plaintiff again and advised her to go home for the day, with pay, and return after the weekend.  *Id.*

at ¶ 37.  At her deposition, Plaintiff explained that after she was sent home from work that day she

"couldn't stop crying. So [she] went to a psychiatric doctor."  Fegley Dec, Ex. A, Deposition of

Patsy Chambers ("Chambers Dep."), 17:22-24.  Plaintiff did not return to work after the weekend,

and on July 10, 2010, Plaintiff submitted a request for leave under the Family Medical Leave Act

("FMLA"), which was approved.  *Id.* at ¶ 39.  Plaintiff remained out of work on a leave of absence

until August 23, 2017.  *Id.*

The parties disagree as to whether Plaintiff ever specifically characterized Mr. Matthews'

behavior as sexual harassment when she reported it to Water's Edge Management.  *See* Def.

SOMF. at ¶ 40; Pl. SOMF. at ¶ 40.  Plaintiff asserts that "[r]egardless of the terminology, [she]

reported Matthews' frequent staring and stalking, and at least one incident of touching, and cited

a hostile work environment."  Pl. SOMF. at ¶ 40.   However, during her deposition testimony,

counsel inquired, "can you point anywhere in any of the exhibits we've looked at where you

complained to Water's Edge that the conduct by Mr. [Matthews] was in the nature of sexual

harassment? Is there anywhere in any of the exhibits that we just looked at where you reported

sexual harassment?"  *See* Deblasio Decl, Deposition of Patsy Chambers ("Chambers Dep"),

---

[2]    A video clip of the interaction was turned over to Plaintiff during discovery, however, the
entirety of the footage was unavailable because it had been recorded over.  Mr. Dallos testified
that Water's Edge's surveillance system records over the old video footage every two weeks, and
thus, only the most recent two weeks video is available, at any given time. Dallos Dep 31:1-3.
However, Mr. Dallos also testified each time he received a complaint, which could be corroborated
by the surveillance videos, he would record the specific period of time when the alleged incident
occurred, based upon what the complainant reported to him. Dallos Dep. 32:20-23.  With regard
to the June 28, 2017 incident, Mr. Dallos preserved the portion of the video that captured the
footage of Mr. Matthews' brushing up against Plaintiff, by recording it with his business cellphone,
and did not preserve the rest.  Dallos Dep. 31:11-23.

165:23-166:9.  In response to counsel's questioning, Plaintiff acknowledged, "No, I didn't report sexual harassment."   During Plaintiff's leave of absence, Mr. Dallos and Ms. Weinberg purportedly continued to investigate the issues between Plaintiff and Mr. Matthews by speaking to other employees.  Def SOMF. ¶ 41.  As part of the investigation, the investigator spoke to two Water's Edge security guards[3], Kevin Jackson and David Cox, Ms. Weinberg, and Lenora Bullock, a recreational aid at Water's Edge.  *See* Fegley Decl. Ex M., Case Progress Report.  Ms. Bullock informed the Water's Edge investigator that Mr. Matthews would make comments, in passing, to the other female employees at Water's Edge, such as "you got a big ass" or "I know your husband enjoys doing it to you."  Pl. Reply SOMF. at ¶75.  Both Mr. Cox and Mr. Jackson reported that they had witnessed Mr. Matthews staring at Plaintiff and that they had heard rumors of inappropriate behavior by Mr. Matthews toward other female employees.  Fegley Decl. Ex M., Case Progress Report.  Mr. Cox told the investigator that between 2014 and 2016, he complained to Mr. Dallos "at least a minimum of three times" about Mr. Matthews' treatment of Ms. Chambers.  *Id*.  During his deposition, Mr. Cox elaborated that he "worked with Plaintiff quite a bit," and that although he "never saw or heard [Mr. Matthews] speak or touch Ms. Chambers," he had observed that Mr. Matthews "intimidated that woman, that he . . . intimidated her until she was going to have a nervous breakdown."  Cox Dep 11:7-8; 15:22 to 16:2.  As part of the investigation, Mr. Cox also submitted a written statement which stated: "Patsy has come to me several times saying she felt very intimated by Terrance. She felt he did various things to get her attention.  I have never seen Terrence say anything to her."  Fegley Decl. Ex. L, Water's Edge

---

[3]    At her deposition, Ms. Chambers testified that a security guard would sometimes "sit[] right next to [her]" in the main lobby, *see* DeBlasio Dec, Ex. 3, Chambers Dep., 59:59 and other times he would be "stationed outside with the residents assisting them with cigarettes" from 4 p.m. to 8 p.m, *id*. 60:8-11.

Incident Report August 3, 2017.  When asked about the discrepancy between his written statement and his conversation with the investigator, Mr. Cox explained, "the reason that [he] didn't write a lot in that statement and it wasn't in-depth, because [he] felt even if [he] wrote something, nothing was going to happen, being [that he had] spoke[n] to Tim Dallos three times regarding Patsy and Matthews, and nothing was done."  Cox Dep., 18:2-15.

Plaintiff returned from her leave of absence on August 23, 2017, and was provided with a memorandum from Water's Edge about the investigation into the harassment complaint.  Def. SOMF at ¶ 44; *see* De Blasio Decl., Ex. 22,  August 23, 2017 Memo to Plaintiff.  The memo advised Plaintiff  that Water's Edge had concluded its investigation and it "decided to reschedule Mr. Matthews' working hours, with his agreement, so that he will not be scheduled to work during [Plainitiff's]  regular working hours" and that if they were working at the same time, Ms. Chambers and Mr. Matthews "each should avoid interacting with the other to the extent possible and practicable."  *Id*.  The memo also advised that, "[a]s an additional protective measure, we require that you get prior management approval before working hours outside of your regular hours . . . you will never be required to work hours outside of your regular hours of work. You can always decline any request to work such hours if the request would require you to work at the same time as Mr. Matthews."  *Id*.  Despite the memo, Plaintiff asserts that Water's Edge did not fully investigate her allegations of her harassment.  Pl. Reply SOMF. at ¶ 44.  At her deposition, Plaintiff explained that she signed the memo because she had to work, and she "didn't like having to see him, but when [told Matthews] wouldn't work around [her], [she] felt a little at ease."  Def SOMF ¶ 46; Pl. Reply SOMF at ¶ 46.

That same day, Mr. Matthews was issued a similar memo which explained that Water's Edge had investigated Plaintiff's claims and that Mr. Matthews' would not be scheduled to work

at the same time as Plaintiff.  Def. SOMF at ¶ 45; *see also* DeBlasio Decl, Ex. 23, August 23, 2017. Memo to Matthews.  The memo also advised that although there may potentially be times when he and Plaintiff would work at the same time, Mr. Matthews was directed to avoid interaction with Plaintiff to the extent practicable and possible, and advised that he was required to obtain management approval before working outside of his normal working hours.  *Id*.  The memo also reminded Mr. Matthews of the Company's prohibition against harassment and enclosed a copy of Water's Edge's policies on that issue.  *Id*.

Following Plaintiff's return to work after her FMLA leave, Plaintiff did not report any additional complaints of harassment by Mr. Matthews until October 9, 2017.  Def. SOMF. at ¶ 47. On that day, Plaintiff was not initially scheduled to work, but was asked to cover another employee's shift because of the Columbus Day holiday.  *Id*. at ¶ 48.  During the course of her employment that day, Plaintiff encountered Mr. Matthews several times throughout the day.  *Id*. When she first arrived at work,  Plaintiff saw Mr. Matthews standing outside of the building, and later saw him leaning on her desk.  *Id*.  Plaintiff reported the incidents to Mr. Dallos who immediately contacted Mr. Matthews and had him removed from the work schedule pending investigation.  Def SOMF. at ¶¶ 49-50.  Mr. Dallos reviewed surveillance camera footage which purportedly showed Mr. Matthews emptying a trash receptable near Plaintiff's work space.[4]  *Id*. at ¶ 50.  Mr. Dallos testified that although, in his view, Mr. Matthews was merely doing his job by changing the trash, he agreed that Mr. Matthews conduct was a violation of the August 23, 2017 memo which directed Mr. Matthews to avoid contact with Plaintiff when possible and practical. *Id*. at ¶ 51.  As a result, on October 12, 2017, Mr. Dallos made the decision to terminate Mr.

---

[4]     Like the surveillance video of the June 28,2017 incident, only a portion of the video was preserved by Mr. Dallos.  *See* Dallos Dep. 29:1 to 34:21

Matthews' employment, and the next day, on October 13, 2017, Mr. Matthews received a Corrective Action Notice advising him that he was being terminated for disregarding the directives laid out in the August 23rd Memo which prohibited him from being near Plaintiff. *Id*. at ¶¶ 52-53. Later that day, Plaintiff met with management at Water's Edge, including Mr. Dallos, and was notified that Mr. Matthew had been discharged. *Id*. at ¶ 54.

However, the Union objected to Mr. Matthew's termination and on October 23, 2017, Ms. Reese, Ms. Dallos, Ms. Weinberg, and Mr. Matthews held a meeting to discuss the matter. *Id*. at ¶56. During the meeting, Ms. Reese asserted that Water's Edge did not have cause to terminate Mr. Matthews, as required under the Collective Bargaining Agreement, and demanded his reinstatement with full backpay or the Union would proceed with legal action. *Id*. Water's Edge refused to reinstate Mr. Matthews and the Union filed a formal grievance on his behalf, asserting that Mr. Matthews was discharged without cause, in violation of the Collective Bargaining Agreement. *Id*. at ¶¶ 56-57. The grievance proceeded to binding arbitration. *Id*. at ¶57. Shortly before the commencement of the arbitration hearing, Water's Edge and Mr. Matthews entered a confidential settlement agreement. *Id*. at ¶57. Mr. Matthews was not reinstated following the settlement. *Id*.

### C.  Mr. Matthew's Conduct Toward Other Female Employees

Plaintiff asserts that Mr. Matthews had a documented history of disrespecting women in the workplace. Pl. Reply SOMF at ¶59. For example, in November 2015, Mr. Dallos issued a written warning to Mr. Matthews for failing to follow instructions, violating company policies, and rudeness toward a female supervisor, Diane Glasgow. *Id*. at ¶60. In a statement related to the investigation, Ms. Glasgow stated that it was "not the first incident where [Mr. Matthews was] using profanity or just being disrespectful." *Id*. Similarly, on June 7, 2016, Mr. Dallos issued a

"final written warning" for another incident involving insubordination and disrespect toward Ms. Glasgow, and disciplined Mr. Matthews by placing him on a one day suspension. *Id*. at ¶ 61. Following that incident, Ms. Glasgow wrote in her statement describing the matter that, it was "not the first or second time [Mr. Matthews] was blatantly disrespectful toward me. [He] is becoming unbearable and it is difficult to work with someone who has no respect for you." *Id*. Defendant acknowledges that both these incidents occurred; however, they assert that both infractions had "nothing to do with harassment." ECF No. 30-1, Def Reply SOMF. ¶¶60-61. On another occasion, Mr. Matthews told another female co-worker to "bring your butt on, lets go," in an attempt to get her to leave the building faster. Pl. SOMF ¶77, Def. Reply SOMF ¶77. In response, Ms. Faust, who purportedly overhead the incident, told Mr. Matthews she "would slap the shit out of him." *See* Pl. SOMF ¶76; *see also* Fegel Dec, Exhibit N, Deposition of Joni Reese. Mr. Matthews countered that if she slapped him, he would slap her back. Pl. SOMF ¶77. Both Mr. Matthews and another employee recalled the incidents at their depositions. *Id*. However, Ms. Faust denied that the incident occurred. Pl. SOMF ¶79.

### D. <u>Plaintiff's Separation from Water's Edge</u>

Even after Mr. Matthews' termination, Plaintiff claims that she was unable to fully recover from the effects of his harassment, and on April 17, 2019, Plaintiff began another FMLA-approved leave of absence. Def. SOMF ¶58. Following that leave of absence, which was initially slated to end on June 8, 2019, but was extended until July 29, 2019, Plaintiff informed Water's Edge that she would not be returning to work. *Id*. Accordingly, Plaintiff's employment was terminated effective July 29, 2019. *Id*.

In September 2019, Plaintiff filed the instant lawsuit in New Jersey state court, alleging that she was subjected to a hostile work environment, in violation of Title VII and NJLAD. *See*

ECF No. 16, Am. Compl., Counts I, IV.  Defendant now moves for summary judgement on both counts.[5]

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ .P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

---

[5]     Plaintiff's Complaint also asserted a vicarious liability theory against Water's Edge (Count II) and a NJLAD and Title VII retaliation claims (Count III).  *See* Compl, Count II-III.  However, on this motion, Plaintiff abandoned her vicarious liability theory and voluntarily withdrew her retaliation claim.  *See* Pl. Br. at 11, 21.  Thus, the only remaining claims for purposes of this motion are Plaintiff's claims of hostile work environment in violation of the NJLAD (Count I) and, an identical claim, under Title VII (Count IV).  Plaintiff also withdrew her claims of discrimination and hostile work environment based on her race, and only asserts gender based claims.  Pl. Br. at 2 n.1.

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

III.   <u>**ANALYSIS**</u>

A.  **Title VII and NJLAD -- Hostile Work Environment Claim**

Plaintiff alleges identical hostile work environment claims under both Title VII and NJ

LAD.  *See* Compl. Count I, IV.  Plaintiff asserts that Water's Edge is "directly liable"  for failing

to implement meaningful and effective training for employees regarding their obligations and

duties under [Water's Edge's harassment and discrimination] policy; failing to monitor

administration of the policy to prevent sweeping complaints of harassment and discrimination

under the proverbial rug;  failing to discipline employees for clear violations of the policy and

creating an atmosphere of lack of concern, lax enforcement, and willful disregard for the policy;

allowing the perpetuation of a hostile work environment despite the plaintiff's repeated efforts to

seek relief.  Compl. ¶31.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with

respect to [her] compensation, terms, conditions, or privileges of employment, because of such

individual's ... sex . . . ." 42 U.S.C. § 2000e–2(a)(1).  Similarly, NJLAD prohibits, *inter alia*,  sex-

based discrimination in the workplace.  N.J. Stat. Ann. § 10:5–12(a).

The standard for establishing a hostile work environment sexual harassment claim under

both NJLAD and Title VII are substantially similar, and thus, the Court will address both claims

simultaneously.  *See Grazioli v. Genuine Parts Co*., 409 F.Supp. 2d 569, 576 n. 10 (D.N.J. 2005)

("Because the hostile work environment analyses for Title VII claims and NJLAD claims are

'strikingly similar' the Court will analyze both simultaneously." (quoting *Caver v. City of Trenton*,

420 F.3d 243, 262 (3d Cir. 2005)); *see also Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d

Cir. 2017) (applying the same elements to hostile work environment sexual harassment claim

under Title VII and NJLAD).   To succeed on  a hostile work environment claim  against  an

employer, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his or her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) a basis for the employer's liability.  *Moody*, 870 F.3d at 213. "The first four elements establish a hostile work environment, and the fifth element determines employer liability."  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)

Defendant seeks summary judgment on both the Title VII and NJLAD claims asserting that Plaintiff has not demonstrated the existence of a hostile work environment, because Mr. Matthews' conduct was not motivated by Plaintiff's sex nor was the harassment severe or pervasive.  Additionally, Defendant argues that even if Mr. Matthews subjected Plaintiff to a hostile work environment, she cannot establish liability against Water's Edge because it responded promptly and appropriately to Plaintiff's concerns.

### i. Sex-based Discrimination

In order to allege a hostile work environment claim based on sexual harassment, a plaintiff must demonstrate that the discriminatory conduct occurred because of his or her sex.  However, in order to make a showing of sex-based discrimination, "the offensive conduct is not necessarily required to include sexual overtones in every instance." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990).  Rather,"it is 'only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff had been a man she would not have been treated in the same manner.'" *Id*. (quoting *Tomkins v. Public Serv. Elec. & Gas Co*., 568 F.2d 1044, 1047 n. 4 (3d Cir. 1977)).  Thus, the harassing conduct need not be sexual in nature so long as it occurs because of the victim's sex.  *Id*.

16

Defendant contends the facts adduced during discovery "establish[] only that there was an interpersonal conflict between Plaintiff and Mr. Matthews." *See* ECF No 24-1, Def. Br. at 6. Defendant contends that "[t]here is no evidence that Mr. Matthews treated other female employees in a negative manner or treated females difference than males," and "[n]one of the conduct Plaintiff complained of is related to gender." *Id*. at 7. Defendant also emphasizes that "Mr. Matthews never made any comments to Plaintiff about her body or female features. He never made any sexual advances or used any sexually-charge language with her. He never touched her in a sexual manner, or in any manner that relates to her gender." ECF No. 30, Def. Reply Br. at 4.

In response, Plaintiff argues that the record includes specific evidence that Mr. Matthews harassed her because of her gender, and that Mr. Matthews generally exhibited hostility toward women at Water's Edge, including his co-workers and his female supervisor. ECF No. 27, Pl. Br. at 2-6. Specifically, Plaintiff asserts Mr. Matthews called her "a little bitch"; another employee corroborated the allegation that Mr. Matthews' often stared at her in an intimidating manner which that employee believed was spurred by Mr. Matthews' sexual attraction to Plaintiff; and that Mr. Matthews had a history of making demeaning comments toward other employees and disrespecting his female supervisor, all of which, Plaintiff argues, support the inference that Mr. Matthews' conduct was motivated by Plaintiff's sex. *Id*. at 5-6.

Here, Plaintiff identifies a variety of incidents of harassment occurring between 2013[6] and 2017, when Mr. Matthews was terminated: in 2013, Mr. Matthews called Plaintiff a "little bitch";

---

[6]      Defendant contends that there is a two-year statute of limitations under NJLAD and thus, Plaintiff is precluded from introducing evidence of discrimination that occurred prior to September 11, 2018. Def. Br. at 10-11. More specifically, Defendant maintain the Court should not consider the incident where Mr. Matthews allegedly called Plaintiff "a little bitch" or the time Mr. Matthews allegedly said "you can't do anything with ignorant people." *Id*. Plaintiff argues that under the "continuing violation doctrine" the Court must consider the totality of the circumstances in deciding whether the conduct was severe and pervasive. Pl. Br. 10 n. 3. I agree. Under the

in 2015, he allegedly stated, "you can't do anything with ignorant people" in reference to Plaintiff; throughout Mr. Matthew's employment at Water's Edge, he would follow her throughout the building and stare at her in an intimidating matter; Mr. Matthews stared at Plaintiff daily;  Mr. Matthews would repeatedly enter the lunchroom during Plaintiff's lunch break, even after she changed the time of her break; despite being instructed to stay out of the lobby area when Plaintiff was working, in June 2017, Mr. Matthews was present in the lobby area, and the next day, he began circulating a petition related to Plaintiff and Mr. Matthews "brushed shoulders" with Plaintiff in the lobby; and in October 2017, Mr. Matthews allegedly leaned against Plaintiff's desk, despite having been told to avoid Plaintiff when possible.  On their face, none of the identified incidents are indicative of sex-based harassment, however, that is not dispositive.[7] Although none the conduct directed at Plaintiff was overtly sexual, the record contains sufficient evidence from which a reasonable jury could conclude that Mr. Matthews' actions were motivated by Plaintiff's

---

"continuing violation" theory, "discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim." *Mandel*, 706 F.3d at 165.  Such acts "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period."  *Id.*  Here, Plaintiff's incidences of harassment involve an overall pattern of harassing behavior by Mr. Matthews, and thus, she is entitled to rely on the continuing violation theory.  Accordingly, the Court will consider the pre-2018 events in assessing the existence of a hostile work environment.

[7]     Although Mr. Matthews called Plaintiff, "a little bitch," the use of the word bitch, alone, is not sufficient to establish sex-based discrimination.  *See Spangler v. City of Philadelphia*, 523 F. App'x 142, 146 (3d Cir. 2013) (granting summary judgment on plaintiff's Title VII sex discrimination claim where plaintiff alleged that her supervisor referred to her as a bitch on one occasion and explaining that "despite the reprehensible nature of this language, insults in the workplace do not constitute discrimination merely because the words used have sexual content or connotations"); *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 455 (D.N.J. 2009) (explaining that "[n]ot all words that have some sexual connotation constitute discrimination because of sex.  Courts have held that the word 'bitch' is not necessarily sexual in nature.").  However, based on that comment, along with other incidents of harassment, as discussed, *infra*, a reasonable fact finder could conclude that Mr. Matthews subjected Plaintiff to a hostile work environment based on her sex.

gender.  For example, Mr. Cox, a security guard at Water's Edge who was stationed near the receptionist desk,  testified at his deposition that Mr. Matthew went out of his way to get Plaintiff's attention, that Mr. Matthews' would peer at her through the window when he was outside smoking, and that Mr. Cox believed, based on Mr. Matthews' behavior, that Mr. Matthews may have been sexually attracted to Plaintiff.  *See* Cox Dep. 20:2 to 25:4.  Similarly, the notes from Mr. Cox's July 26, 2018 interview with Water's Edge's management, as part of the investigation into Mr. Matthew's behavior, revealed that "Matthew [was] always fixated on Ms. Chambers. Cox said [in] [his] personal opinion he felt Matthews was sextually attracted to Ms. Chambers. Coz said he had some sort of fixation on Patsy he couldn't take his eyes off her to save his life."   Fegley Decl, Ex. M, Investigator's Case Progress Report.   During his interview with the investigator, Kevin Jackson, a security guard at Water's Edge, also told the investigator, that he "personally felt that Mr. Matthews had a thing for Patsy (like a sexual thing)" and that he "worked with Patsy at night and she would tell [him] that Matthews would bump up against her at the time clock or  . . .  walk by the front desk multiple times to grab her attention."  *Id*.

Moreover, Mr. Matthew's treatment of his other female co-workers and his female supervisor is also suggestive of a sex-based motivation for his actions.  Both Mr. Cox and Mr. Jackson told the investigator, during their interviews with Water's Edge's management, that they were aware of other female employees who were made "uncomfortable" by Mr. Matthews.  Fegley Decl, Ex. M, Investigator's Case Progress Report.   Additionally, on two separate occasions, Mr. Matthews was written-up for disrespect and insubordination toward his female supervisor.  *See* Fegley Decl, Ex. P., Diane Glasglow Complaint, November 17, 2015; Ex. O, November 24, 2015 Corrective Action Notice.   Lenora Bullock, another Water's Edge employee, described Mr. Mathews as "a fresh person" who "would like say fresh things to females, he was that type of guy."

Fegley Decl, Ex. T, Declaration of Lenora Bullock, 14:4 to 16.  Ms. Bullock elaborated that  Mr. Matthews would often say things like "you got a big ass" or "I know your husband enjoys doing it to you" to the female employees at Water's Edge.  *Id*. at 14:12-16-1.  Although these comments were not directed at Plaintiff, they, nonetheless, bear on the analysis of whether Mr. Matthews' various comments toward Plaintiff were spurred by Plaintiff's gender.  *See  Caver v. City of Trenton*, 420 F.3d 243, 264 (3d Cir. 2005) (explaining in the context of a race-based hostile work environment claim that "[c]omments not directed at a plaintiff or uttered out of a plaintiff's presence may be considered in determining whether 'facially neutral' conduct was actually based on a plaintiff's race."); *Hargrave v. Cty. of Atl.,* 262 F. Supp. 2d 393, 415 (D.N.J. 2003) (noting that "[p]laintiff's testimony also suggests that she was aware that several other female employees had allegedly been subjected to similar sexually offensive comments," which supported a finding of hostile work environment).  Taking these events into account, under the totality of the circumstances, a reasonable fact-finder could find that Mr. Matthews exhibited hostility toward women in the workplace and that Plaintiff was signaled out and treated by Mr. Matthew in a harassing manner because of her gender.  Although Mr. Matthews, during his deposition,  denied that any of the conduct occurred, this merely creates a dispute of fact, which must ultimately be determined by a jury.  *Big Apple BMW, Inc*.,  974 F.2d at 1363 (3d Cir. 1992) ("it is inappropriate for a court to resolve factual disputes and to make credibility determinations . . . . Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.").

Assuming, for the purposes of this motion, that Mr. Matthews did make the vulgar comments to other female co-workers, those facts, coupled with Mr. Cox's testimony about Mr.

Matthews' potentially sexual motives, provide sufficient evidence from which a reasonable jury could conclude that Mr. Matthews' actions occurred because of Plaintiff's gender.

### ii.  Evidence of Severe or Pervasive Conduct

The hostile work environment standard is an objective one, based on "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).  To determine if the alleged harassment is so hostile or abusive as to be unlawful, the Supreme Court directs courts to "look[ ] at all the circumstances." *Id* at 21.  Whether a workplace is hostile or abusive must be determined in light of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.  "'[S]everity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Jensen v. Potter,* 435 F.3d 444, 449 n.3 (3d Cir. 2006) (quoting 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, Employment Discrimination Law and Practice 455 (3d ed. 2002)); *see also Castleberry v. STI Grp.,* 863 F.3d 259, 264 (3d Cir. 2017) (clarifying that "[t]he correct standard is severe <u>or</u> pervasive"(emphasis added)); *Lehmann*, 626 A.2d at 455 (explaining that the severe or pervasive test under NJLAD is "disjunctive" and "[t]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct" (citation and internal quotation marks omitted))

Generally, "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

However, a single incident is severe if it is sufficiently  "extreme to amount to a change in the terms and conditions of employment." *Castleberry*, 863 F.3d at 264-65 (holding that "a single isolated incident" where  plaintiff's supervisor  used a racially charged slur in front of plaintiff and plaintiff's coworkers, and threatened termination "[w]ithin the same breath" was sufficiently serious to create a hostile work environment).  Incidents of harassment are pervasive when they occur "either in concert or with regularity." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir. 1990); *see  Webb v. Merck & Co.,* 450 F. Supp. 2d 582, 598 (E.D. Pa. 2006) (finding "severe or pervasive harassment" where, over the course of one year, plaintiff's supervisor, who oversaw an all-African American crew, repeatedly referred to himself as a "zoo-keeper" and the men on his shift as "my animals," and disciplined plaintiff more harshly than white co-workers for similar mistakes); *Grazioli v. Genuine Parts Co.*, 409 F.Supp.2d 569, 578 (D.N.J. 2005) (finding a pervasive sexual harassment where defendant sang offensive, sexually-related song on a daily basis).

Here, Defendant asserts that Mr. Matthews' alleged conduct was not sufficiently severe or pervasive to constitute a hostile work environment.  Def. Br. at 7-12.  Defendant contends that "the comments and conduct are nothing more than common, albeit negative, workplace interaction[s] and perhaps insensitive stray remarks and could not have created an abusive work environment." *Id*. at 11.  Further, Defendant highlights that the incidents occurred over the course of more than 4 years, and that aside from the alleged brushing of shoulders, Mr. Matthews never engaged in physical contact with Plaintiff or sought to physically intimidate her.  *Id*.

Plaintiff contends that she has adduced evidence which sufficiently satisfies the severe or pervasive prong; specifically, she points out that Mr. Matthews' "[s]talking and staring . . . was a near daily occurrence," which was corroborated by the testimony of other employees.  Pl. Br. at 8.

Plaintiff further asserts that the severity of the harassment is evidenced by the fact that Mr. Matthews' conduct caused her to become nervous, agitated, and reduced her to tears on several occasions, which unreasonably interfered with her work performance, and she was eventually forced to take FMLA leave from June 28, 2017 to August 23, 2017, in order to seek mental health treatment for anxiety and depression.  *Id*. at 9.

I find that Plaintiff has shown that Mr. Matthew's conduct may constitute severe and pervasive harassment.  In addition to each of the specific incidents of harassment which Plaintiff reported to Water's Edge management, the record also contains evidence demonstrating that Plaintiff complained that Mr. Matthews stared at Plaintiff on a daily basis for an extended period of time, and routinely followed her around the facility.  For example, Mr. Cox told the Water's Edge management investigator that "8 out of 10 times Patsy would walk away from anywhere Matthews was. Patsy would stay clear of Matthews she would go in the opposite direction . . . it happened so many times and she would constantly to try to avoid him," and "when Matthews would walk into the lobby Patsy would get the brochure holder and place it in front of her face to block [her] from seeing him. . .  this happened every time they worked together."  Fegley Dec, Ex M., Case Progress Report.  Additionally, Plaintiff testified at her deposition that "every time [she] would go anywhere Terrence would follow [her]" and that "he would follow [her] no matter where [she] went in the building."  De Blasio Dec, Ex 1, Chambers Dec., 88:9.  In her June 26, 2016 incident report,  Plaintiff also said that "Mr. Matthews would sit across from her "staring and looking, not taking his eyes off me looking mean. He stares and makes me uncomfortable and nervous . . . [he] sits directly across from me on the edge of the chair at least two to three times a day staring. I use a brochure at the front desk to block his staring. Then he moves to the other chair across from the desk and stares more. I turn my chair so he can't see my face. I feel intimidated,

threatened. This is scary and uncomfortable."  DeBlasio Decl, Ex. 16, June 26, 2017 Incident Report.  Plaintiff purportedly feared for her physical safety, cried at work on several occasions, and resorted to taking a leave of absence in order to obtain treatment for anxiety as a result of Mr. Matthews' harassment.  Thus, it is clear that Mr. Matthews' conduct interfered with her work performance.  Based on the alleged daily staring, the stalking, and the seemingly severe impact of Mr. Matthews' conduct on Plaintiff, a reasonably jury could conclude that Plaintiff was subject to severe or pervasive harassment.

Accordingly, Plaintiff has proffered sufficient evidence from which a reasonable fact finder could conclude under the totality of the circumstances that the alleged discriminatory acts were "severe" or "pervasive."

### iii.  Water's Edge's  Liability

An employer's liability for unlawful harassment, under both Title VII and NJLAD, depends on the status of the employee perpetrating the harassment. If the harassing employee is a co-worker, as opposed to the plaintiff's supervisor, the employer is only subject to liability if the employer was negligent or reckless in responding to the harassment.[8]  *See Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) ("An employer will be liable for the harassing conduct of the alleged victim's coworker if the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." (quoting *Bonenberger v. Plymouth Twp*., 132 F.3d 20, 26 (3d Cir. 1997)); *see also Lehmann*, 626 A.2d 445 (explaining that under NJLAD "[w]hen an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the work environment hostile. The

---

[8]      The parties do not dispute that Mr. Matthews, the only employee responsible for creating the hostile work environment, was Plaintiff's co-worker and not her supervisor.

employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser.").  Generally, "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston v. Procter & Gamble Paper Prod. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009); *accord  Bumbarger v. New Enter. Stone & Lime Co.*, 170 F. Supp. 3d 801, 838 (W.D. Pa. 2016).  Furthermore, "[e]ven if the remedial action does not stop the alleged harassment, it is 'adequate' if it is 'reasonably calculated' to end the harassment." *Andreoli*, 482 F.3d at 644; *see also Payton v. N.J. Tpk. Auth*., 691 A.2d 321, 328 (N.J. 1997) ("Effective measures are those 'reasonably calculated to end the harassment' "(quoting *Lehmann*, 626 A.2d 445)).  "A remedial action that stops the harassment is adequate as a matter of law," and cannot form the basis for Title VII liability. *Id*. Establishing the employer's recklessness or negligence in responding to the harassment "is not an affirmative defense, but rather the burden of the plaintiff."  *Fornicoia v. Haemonetics Corp.,* 131 F. App'x 867, 871 (3d Cir. 2005).

Here, Defendant contends that even if Plaintiff has produced evidence of facts demonstrating a prima facie case of hostile work environment, because Water's Edge "exercised due care to prevent the alleged harassment and [properly] responded to all of Plaintiff's concerns," there is no basis for employer liability.  Def. Br. 13-16.  In Defendant's view, the undisputed facts demonstrate that Water's Edge responded immediately and appropriately each time it received notice of alleged harassment from Plaintiff and that Water's Edge's anti-harassment policy was effective because Plaintiff acknowledged receipt of the policies, was aware of them, and successfully utilized them to redress her issues with Mr. Matthews.  *Id*. at 15-16.

25

Plaintiff maintains that Water's Edge's "negligence or recklessness must be evaluated based on how well or poorly it implemented its anti-harassment policy," *id*. at 12, and here, Plaintiff argues Water's Edge failed to respond adequately to her complaints.  For example, Plaintiff asserts that Water's Edge did not thoroughly investigate Plaintiff's claims and failed to discipline Mr. Matthews for 1) his violation of the smoking policy, which gave rise to Plaintiff's 4/23/17 complaint; 2) his presence in the lobby on June 6, 2017, despite being told to avoid Plaintiff; 3) circulating the petition about Plaintiff on June 21, 2017; and4) brushing up against Plaintiff in the lobby on June 28, 2017.  Pl. Br. at 17.  Furthermore, Plaintiff emphasizes that Water Edge's management did not follow through with its promises, and argues that on September 16, 2015, Mr. Dallos stated that he would fire Matthews if there was another incident of rudeness toward Plaintiff, but despite several incidents in the intervening time period, Mr. Matthews was not terminated until October 13, 2017.  *Id*. at 15.  Moreover, Plaintiff asserts that Water's Edge acted with reckless indifference in addressing Plaintiff's complaints. Pl. Br. at 20- 22. For example, Plaintiff contends that Mr. Dallos "acted intentionally to minimize the plaintiff's complaints and shield Water's Edge from potential liability by spoliating evidence," and "preserving only what he deemed pertinent through use of his own hand-held cellphone camera."  *Id*. at 22.

As a preliminary matter, Plaintiff has not alleged that she lacked "a reasonable avenue" for complaint.  *Huston*, 568 F.3d at 104.  Indeed, the very facts of this matter demonstrate that there was a grievance process available to Plaintiff and that she utilized it.  Accordingly, in order to make a showing of employer liability, Plaintiff must demonstrate that Water's Edge "failed to take prompt and appropriate remedial action."  *Id.*  I find that Plaintiff has not demonstrated a material dispute of fact regarding the propriety of the remedial actions taken by Water's Edge.

Plaintiff's dissatisfaction with Water's Edge's remedial action largely turns on Mr. Dallos' alleged failure to preserve all of the relevant video evidence, and Water's Edge's failure to fire Mr. Matthews prior to October 2017.  While Plaintiff correctly points out that Mr. Matthews was not disciplined for every instance of alleged harassment, during his deposition, Mr. Dallos explained that "every incident is looked at individually based on merit and what the investigation shows" in order to determine what, if any, discipline is necessary."  Dallos Dep. 74:17-19.  Moreover, Plaintiff's arguments presume that discipline or termination are the only acceptable "remedial measure."  Critically, in this regard, neither Title VII nor NJLAD require the employer to respond perfectly to a harassment complaint, so long as the employer takes "measures reasonably calculated" to end the harassment.  *Andreoli*, 482 F.3d at 644; *Payton*, 691 A.2d at 328  Although Plaintiff believes Water's Edge should have terminated Mr. Matthews' employment earlier than it did, and disciplined him more forcefully, "a remedy need not include discipline to be adequate." *Roadman v. Select Specialty Hosp.*, No.16-246, 2020 WL 571058, at *5 (W.D. Pa. Feb. 5, 2020).  Moreover, "the employer's remedy does not need to be adequate from the complainant's perspective. An employee cannot dictate that the employer select a certain remedial action, such as demanding that the alleged harasser be fired or transferred."  *Id.* In *Roadman*, the court found that the employer's remedial action was appropriate where the employer separated the plaintiff from the employee who was sexually harassing her, and there were no further allegations of harassment.  *Id.*  Although the plaintiff, in that instance, "wanted a guarantee from [her employer] that she would never have to work in proximity [to her harasser]," the court found that "as a matter of law, the employer was "not required to make such a promise."  *Id.*  Moreover, the court concluded that the employer's "response to Plaintiff's complaint was reasonably calculated to prevent further harassment and is adequate as a matter of law."  *Id.*  Here, it is not this Court's role

to second guess an employer's disciplinary decisions, or assess whether Water's Edge could have taken more aggressive disciplinary action against Mr. Matthews, or whether Water's Edge could have terminated Mr. Matthews sooner than it did; rather, on this motion for summary judgment the Court's obligation is to determine whether, there are disputed facts regarding whether Water's Edge took remedial actions which were "reasonably calculated to end the harassment." *Andreoli*, 482 F.3d at 644; *Payton,* 691 A.2d at 328.

It is undisputed that each time Plaintiff reported an incident of harassment, Water's Edge promptly investigated the incident.  For example, in 2013, when Mr. Matthews allegedly called Plaintiff, "a little bitch," Mr. Dallos investigated the incident and interviewed Mr. Matthews regarding the comment.  Def. SOMF. at ¶15-18.  However, because Mr. Dallos was purportedly unable to determine whether Mr. Matthews had, in fact, used a vulgar word, Mr. Matthews was not disciplined following that incident.  *See* DeBlasio Dec, Ex. 7, Deposition of Timothy Dallos, 75:11-16.  In April 2017, when Plaintiff reported that Mr. Matthews would often go into the lunch room and stare at her during her lunch hour, despite her best efforts to avoid him, Ms. Weinberg informed Plaintiff that she would modify Mr. Matthew's work schedule and, in fact, did so.  Pl. SOMF. at ¶26.  In June  2017, when Plaintiff reported that Mr. Matthews entered the reception area,  Mr. Dallos promptly made his way to the scene, observed Mr. Matthews speaking to one of the residents in the lobby, and reminded him to stay out of the reception area when Plaintiff was working.  A few days after that incident, Water's Edge Management directed Plaintiff to submit a written statement outlining all of the incidents with Matthews, and began the process of investigating the incident.  *Id*. at ¶34.  That same day, Water's Edge Management met with Mr. Matthews and a union representative to discuss the incident and Mr. Matthews agreed to minimize his interactions with Plaintiff.  *Id*.  A few days later, however, on June 28, 2017, when Water's

28

Edge Management met with Plaintiff to inform her of the outcome of the meeting with Mr. Matthews, she revealed an earlier incident where Mr. Matthews "brushed shoulders" with Plaintiff, the only reported incident of physical contact between them. *Id*. The management team, again, promptly began investigating that new allegation *Id*. ¶ 37. At Plaintiff's direction, Mr. Dallos looked at the surveillance video from the incident – albeit he failed to preserve the entirety of the video -- and advised Plaintiff to go home, with pay, while they investigated and return after the weekend.[9] *Id*. at ¶39.  During the investigation process, several Water's Edge employees were interviewed, and at the conclusion of the process, Water's Edge issued a memo directing Mr. Matthews and Plaintiff to avoid each other to the extent practicable and modified both of their work schedules so that they would no longer be on the premises at the same time. *Id*.  When Mr. Matthew failed to abide by Water's Edge's directions, he was promptly terminated, and Water's Edge did not reinstate him – despite pushback from the union.

Thus, the record reveals that after each instance of reported harassment, Water's Edge management, at minimum, investigated the incident and addressed it by speaking to Mr. Matthews regarding his conduct.  When it appeared that speaking to him was insufficient, and when  Mr. Matthews' behavior elevated from isolated instances of rudeness, to physical interactions,  Water's Edge modified Plaintiff and Mr. Matthews' working hours such that they would no longer be present on the premises at the same time. *Id*. ¶44.  Water's Edge not only changed Plaintiff's working schedule, the company, in fact, promised Plaintiff that she would never be required to work the same shift as Mr. Matthews, as part of her regular schedule, and that she if she was assigned to work outside of her regular hours, she could "always decline any request to work such

---

[9]     Defendant does not dispute that Mr. Dallos failed to preserve the entirety of the video, nor does it dispute that this portion of the video depicted the incident, as Plaintiff described. Thus, even taking Plaintiff's version of events as true, summary judgement is still appropriate.

hours if the request would require [her] to work at the same time as Mr. Matthews."  De Blasio Decl., Ex. 22,  August 23, 2017 Memo to Plaintiff.  While Plaintiff did work with Mr. Matthews again, it was on a voluntary basis.  Def. SOMF ¶ 48.  Indeed, Plaintiff could have refused to cover her co-worker's shift, consistent with Water's Edge's promise in the August 23rd Memo, and avoided Mr. Matthews, entirely.  Moreover, when Mr. Matthews violated the directive set forth in the August 23, 2017 memo, he was terminated mere days later.  As a result, I find that, there is no genuine issue as to a material fact regarding whether Water's Edge took action which "was reasonably calculated to prevent further harassment" and did, in fact, protect Plaintiff from such future harassment from Mr. Matthews.  S*ee Huston*, 568 F.3d 104,110 (holding that there was no genuine issue as to a material fact regarding whether the employer's remedial action was adequate where the employer promptly investigated the situation the same day plaintiff filed her complaint, moved her to a different team where she did not work with the alleged harassers, interviewed the individuals who plaintiff mentioned in her complaint, and disciplined employees who had perpetuated the harassment, and harassing conduct ended after the investigation); *Andreoli*, 482 F.3d at 644 (holding that that there was no genuine issue as to a material fact regarding the adequacy of the employer's remedial action where management undertook an investigation of the employee's complaint within a day of being notified of the harassment, spoke to the alleged harasser about the allegations and the company's sexual harassment policy, and warned the harasser that the company does not tolerate any sexual comments or actions).

Although Water's Edge could, conceivably, have terminated Mr. Matthews sooner or implemented harsher discipline, the measures they took were clearly reasonably calculated to end Mr. Matthews' harassment, which is sufficient to establish a reasonable remedial action as a matter of law.  *See Griffin v. Harrisburg Prop. Servs.*, Inc., 421 F. App'x 204, 209–10 (3d Cir. 2011)

(holding that that there was no genuine issue as to a material fact regarding whether the employer's remedial action was adequate, even though "[employer could] have taken additional steps to address Kimble's offensive behavior" because employer "commenc[ed]an investigation immediately, grant[ed] [plaintiff's] transfer, discipline[ed perpetrator], and institute[ed]diversity training" which was sufficient remedial action).  As the Third Circuit has explained, " 'whether a chosen remedy was reasonably calculated to prevent further acts of harassment can be answered at the time that remedy is put into place.' Thus, the fact that a harasser may persist in the offensive conduct does not preclude a determination that the remedy was adequate." *Neely v. McDonald's Corp.,* 340 F. App'x 83, 86 (3d Cir. 2009) (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 415 (3d Cir. 1997)).  Here, Plaintiff complained each time she felt harassed, understanding she had recourse under Water's Edge's policies. Water's Edge then investigated within a day of receiving a complaint,  took action, such as speaking with Mr. Matthews, and directing him to remain away from Plaintiff's post. Then, Water's Edge changed both Mr. Matthews' and Plaintiff's work schedules so that there would be no contact, and finally, terminated Mr. Matthews, despite his Union's opposition.  Hence, I find that there is no genuine issue of material fact that Water's Edge took remedial action that was adequate.

Accordingly, Defendant's motion for summary judgement on Plaintiff's Title VII and NJLAD hostile work environment claims is granted.[10]

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**.

Date: July 17, 2020

---

[10]     Defendant also seeks summary judgement on Plaintiff's claim for punitive damages in connection with her hostile work environment claims. Because I find that Defendant is entitled to summary judgement on Plaintiff's underlying claims, I need not address the parties' arguments on that issue.

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge